Thank you, Your Honor, and may it please the Court. My name is Brian Sells, and I represent Appellants Steve Kelly and Clarice Dreyer in this appeal. We ask this Court to reverse the judgment of the District Court because the record establishes that my clients had standing to bring this case, and because on the merits, this case is effectively controlled by Anderson v. Celebrezzi, and this Court's decision in Mader v. Brewer. Now, unless this Court has any questions about the standing issue, I'm happy to receive those. I think most of the action is on the merits, but I'm happy to take your questions. Well, part of my problem is if we were to disagree with the district judge and hold that either one or both of your clients have standing, the district judge has not even begun to address your substantive claims. And while this is summary judgment, and this probably is a case that can be determined on summary judgment, I'm a little reluctant to have us have a go at this without first hearing from the district judge on the point. But that's off to one side. I don't want to talk about standing for just a minute. Okay. Certainly. Assuming for the moment that Mr. Kelly has to have standing as a would-be candidate and you understand I'm assuming, I'm ignoring for the time being the language that's in the first paragraph of Roman II in the Aram case, why should we conclude on summary judgment that your client was, in fact, would have been a candidate but for these obstacles? Well, Your Honor, I think that on summary judgment you have the reasonable inferences that you have to draw from one side or the other. And there is no evidence in the record from which to draw a reasonable inference that my client did not want to associate with others through the political process to advance his political beliefs. He said in his verified complaint that's what he wanted to do. And there's nothing in the record from which one can draw a reasonable inference to the contrary. Now, I assume he told somebody or said to somebody that he had no intent to run. That was a bulletin board posting. He says he was joking. And that occurred much before he actually filed this declaration asking the federal court to put him on the ballot. As I say in the brief, if there was ever an indication that someone was serious about getting on the ballot, it's a federal lawsuit asking a judge to put him on the ballot. Let me ask you this. Standing is a jurisdictional issue, correct? Yes, sir. And why was not the district judge authorized to decide that question on disputed facts? Why is that a merits issue? It's a jurisdictional issue. Why could not the district judge take evidence, which he did, and decide the facts of jurisdiction? Isn't that the judge's job? Your Honor, I guess I'm not sure I understand the question because I'm not saying that it's a merits issue as much as I'm saying that at the preliminary stage where you're relying on affidavits and you don't have a full record. But normally a jurisdictional issue presented to the trial court, if there are disputed issues of fact, doesn't the judge decide those? He or she has a hearing and decides whether there's a diversity case, whether there's a jurisdictional amount in a case like this, whether there's standing. And those are factual findings. And why didn't the judge decide the facts here? Why do you say that there's a later time somehow somebody else or the district judge has to decide the facts? Well, the judge did make the factual finding in this case, Your Honor. I'm saying that it was an unreasonable factual finding. The evidence, the only evidence on which the court relied doesn't even support the inference of the law. So your argument would be that he was clearly erroneous in deciding the facts? If that's my standard, that's my argument, Your Honor. I think I could certainly fit within the clearly erroneous standard when you have Mr. Kelly, a former candidate, a guy with some very strong political views. He says in his verified complaint that he wants to run. And if you read his testimony at the hearing, he explains why he wanted to run. And it's quite coherent. So to conclude to the other side, it's clearly erroneous. Let me ask you about a variation on Judge Jones's question. Sure. Is there a jury ever going to be involved in this case, or is this a bench trial start to finish? It's a bench trial start to finish. I see. So whether the judge decides it now, whether the judge decides it later, the judge will decide whether Mr. Kelly was serious about running. Well, if you send it down, I hope it's a different judge. And I understand that you've asked us to send it back to a different judge. That's correct. But assuming it goes back to the same judge, the fact that the judge might have mislabeled this as summary judgment, the fact it's coming back to him leads me to believe you're going to get the same answer out of him, unless you tell me that there are a lot of facts not before the court that you're about to introduce that will totally change his mind. If it goes down and I'm allowed to introduce extra evidence, I will get my client to pinpoint the week within which he made that decision. He was very loosey-goosey in that. He sure was. Because he'd already answered the question three times, Your Honor. He'd already answered the question three times by that. He's answered it a whole bunch of different times. Yeah. And a whole bunch of different ways. Certainly. So you'll give him one more way, and then the judge is going to change his mind. I think the way that matters the most is the way he did it in writing in his verified complaint. Yeah, I know that's what you think. Let me ask you a different question, though, because I find somewhat – I mean, the question as to whether or not your client seriously intended to run and whether we can get past the district judge's finding that he did not, that's a hard one for me. I could say as a technical matter, this is summary judgment, and there are some disputed questions of fact which I think there are. But it's almost a fruitless exercise, if this is going back to the same judge, to decide it now as a matter of fact rather than as a matter of summary judgment. There's another rationale that you point to in Roman II, Section Roman II of Aram that says, quite to one's sadness whether the candidate intends to run, voters have standing to challenge these valid access provisions. And I guess I'm not really asking you so much as I'm highlighting to the State that the State never responded to that argument. I mean, you cite Aram. The only part of Aram you're citing is the part that discusses whether the individual is likely to run. But there's a very clear paragraph in Judge O'Scanlan's opinion that says even if he is not going to run, these two, in that case, these two registered voters have standing. Boom. And you never responded. Judge Fletcher, if I could just disagree slightly with your premise, because I don't think Judge Haddon's finding was that my client was not a serious client who didn't want to run. I think his finding is that my client did not decide to run until two weeks after he judged. Judge Haddon does not find that he is not, at the point of the hearing, at any point after tax day, that there was any question about his wanting to run. It's simply a matter of timing and poof, because there was no intent on the date of filing the complaint. The whole case goes away. So I think that's an important point. I could see how I can poke holes in what Judge Haddon decided. One could say, well, he decided not to run, and the reason he decided not to run was that it was very difficult and expensive. But he never said that. Kelly didn't say he didn't want to run because it was difficult and expensive. The deadline had passed. Well, in a way, he kind of did in that blog post, where he says it's a lot cheaper not to run. It's more fun, too. But he also said it's cheaper. Okay. He has a dry sense of humor, my client does. Your Honor, if there are no other questions on standing, I'm happy to answer as many as you've got. I'm finished on standing with respect to you. Thank you. I want to emphasize two points about the facts on the merits. Number one, this is the unusual case where we have smoking gun evidence of motivation. And it appears on pages 338 and 339 of the record excerpts. And the state, to its credit, brought these to light in its brief. And they've been in the record all along, and they've been quite frank about it. The deadline was moved from June to March because a candidate for sheriff from Rosebud County was upset about the fact that he'd gotten through this contested primary only to find out that independent candidates challenged him or filed to challenge him in the general election at the last minute, and he did not like that. So let's change the deadline so that can't happen. I did notice that the establishment politicians in Montana have been supportive of the state with their affidavits. They don't like, they don't want these guys coming in, it's pretty clear. Right, right. Well, and here's why that's important. And I think it's explained best by Justice O'Connor in her concurring opinion in Klingman v. Beaver. Now, you know, Justice O'Connor was the only justice with legislative experience. And she said, let's not pretend that the state is some neutral arbiter. The state is controlled by the political parties. We're humans, we're all people. And she said, those parties and those legislators have a natural incentive to shape the rules for their own benefit. It's called the instinct for self-preservation. So she explains that what the Anderson test does is help us all distinguish between laws that are really designed to serve the state's legitimate interests and those that where those asserted interests are merely a pretext, she says, for anti-competitive restrictions. But here we don't need to make that tough decision because we know what the motivation is. We know that the motivation is anti-competitive. And that is inconsistent with the First Amendment values that this court is bound to protect. So that's the first thing I want to point out. The second thing I want to point out about the merits is that this is not a case that where the state of Montana is nipping at the underside of the constitutional line. This is a case where the state of Montana has taken the constitutional bar and thrown it on the floor. No, before we get, you know, the height. That works in the jury, but I, you know, I think we've been there, done that. I think a lot of us are familiar with the political process. We didn't get here by not running a gauntlet of the political process. So aside from all of those metaphors, I'd like to bring to merits a question on the record. The state has put forward evidence, both in the testimony and declaration, as I understand it, about why, setting aside the sheriff's peak and anti-competitive attitudes, why there is a rational basis that would, I think they're arguing even under strict scrutiny, would justify the deadline because of the burden that it would impose on the verification process, which in light of everything else. And I don't see in your reply brief much that deals with the specifics of that sort of one-liner throwaway. So tell me why that doesn't, if we were to go ahead and address the merits, wind up causing you to lose. Right. Your Honor, we addressed that mostly in our opening brief because we anticipated the state's justifications based on their briefing in the district court. And so that discussion is in our opening brief. We didn't repeat that in our reply brief. But what we did in our opening brief is we pointed to the deposition that I took of Lisa Kimmett. That's the state election official. And I tried six ways to Sunday to get her to explain to me what it was that she needed this extra time to do. Now, bear in mind, it doesn't give election officials more time. They still only have a week. It's a question of which week do we verify these signatures in. And I asked her to explain to me why a week in June or July or August was incompatible with them getting their other stuff done. And it's basically we're too busy dealing with the real candidates. And I want to bring your attention in particular to a couple of pages that I didn't cite in my brief, but looking back on the record, I think are actually quite important. And those are pages 592 and 593 of the record excerpts. And that's where I asked Ms. Kimmett about how long it takes to verify signatures. Now, the signature verification process for a statewide candidate is not centralized. You turn in your petition to the counties. And so in a whole state, a county might only have a few petitions to verify. I asked her how long it takes to verify one petition page. She said 15 minutes. That's how long it takes to enter it. And then they have to, on a sampling basis, go verify some percentage of the signatures to make sure the signatures match. The first step is we enter the petition to make sure the people are registered voters. And then we check some of the signatures. She said two minutes for the signature verification. And I think that utterly undermines this need to – What's the minimum number of signatures they need here? Well, in this particular race, it was just over 10,000. 10,000. And to get 10,000 qualified, what's the rule of thumb? Twice that many? No, it's not quite twice. It's about a quarter more. I think that appears in the affidavit of Mr. Pearson that we supplied. Well, 13,000, then they'd have times two. How many minutes is that? Well, no, Your Honor. You don't have to use that two minutes on every signature. There's a sampling. So out of a petition page with 25 or 30 signatures on it, you might sample one or two signatures. That's the testament. Excuse me? That's the testament. That's the law of the State of Montana that's cited in both parties' briefs. That's how the signature verification – But do the math for me. Roughly how long, according to her testimony, would it take her office to verify signatures for one of these? I don't mean a single petition, but all the petitions that are handed in for a particular case. Okay. It wouldn't be her office because it's distributed. Right. It's decentralized. So I haven't done the total person hours that it would require, but some of that would depend on whether every petition's sheet is full. But you might, as a rough estimate, say 20 signatures per petition times 15 minutes plus maybe two to four minutes each, and then multiply that up to 10,000. But she also emphasized that it's not the kind of job that requires significant training. Training only takes a half an hour. You can hire attempts to do it, and that's right around those pages that I cited. It's the kind of job that the State can and does do much more regularly with respect to initiative petitions that require far more signatures. The bottom line is, the State's justification is, these are not important candidates. We can't afford that level of democracy. They belong on the bottom of the totem pole, and that's why we're going to shift the task of verifying those signatures to a time that is the calendar equivalent of Siberia. Well, given the third-party energies that are emerging, maybe they'll face a larger group of people. Well, one can only speculate what would have happened if Senator Baucus had had some serious competition in the 2008 race from the left. My understanding of the Montana system is, it's actually quite easy to get a candidate on who's running for a minor party. It's the independents who are having trouble. I wouldn't say it's quite easy, but it's much easier, yes. So the hard part is really for an independent, such as Mr. Kelly, who here is not trying to run, or to the extent he's trying to run, he's not trying to run as a Green Party candidate. He's trying to run as Kelly. That's right, Your Honor. It's a completely different system. And in fact, under the minor parties, as the State has pointed out repeatedly, the voters of the State of Montana have shown great interest in having more choices for which to choose. Let's suppose he wanted to run as a Tea Party candidate, which is not an organized party per se. Would he be as an independent, or would he be as a minor party? I think under Montana law, he could choose to do either. He could be what Montana law recognizes as an unqualified minor party, in which that party only has one candidate. And you don't submit a party qualification petition. Or he could submit a party qualification petition, and then the Tea Party could run as many candidates as it wants without submitting any more petitions. If it were, but it would have to qualify as a party. That's correct. And it may have. I don't know. I'm not asking for a definitive answer in the sense that that particular party, but as an example currently of people who run and identify themselves with that label, but it's not clear that there's a party structure. That's right. OK. We've taken you over. Let's hear from the State, and we'll then give you a chance to respond. Thank you. I appreciate it, Ron. Thank you, Judge Fletcher, and may it please the Court. I'm Anthony Johnstone, the State Solicitor for Montana. The question presented on the merits, if we get there, is whether, considering the entire statutory scheme in Montana, reasonably diligent candidates normally gain a place on the ballot. The record is that Mr. Kelly has been on the ballot, but for, with only the exception of the signature deadline, he is qualified under all of these rules in 1994. He is qualified as a Democratic Party candidate on the general election in 2002. He was preparing to qualify for the Green Party in 2007 until he dropped that effort. He could have petitioned as a independent or a one-person party with the exact same designation on the ballot as an independent, with just 5,000 signatures, a level that he concedes is constitutionally sound. But he attempted none of these, and our standing argument is, like most of justiciability, really a practical argument. Can I ask you to address the point that I signaled that I would ask you to address? I'll just read to you the paragraph from Justice O'Scala's opinion for the panel on Aram v. Cayetano. It's on page 691 of 2nd 881, the first paragraph in Roman II. Are you with me? Yes. Lieutenant Governor contends that Aram lacked standing to challenge the 10% requirement because it didn't come into play to exclude him, da, da, da. But Aram brought this action in his capacity as a registered voter of the state of Hawaii, as well as in his capacity as an erstwhile and potential future candidate. Candidate eligibility requirements implicate basic constitutional rights of voters, as well as candidates. Therefore, even if the Lieutenant Governor's contention is meritorious, Aram possesses standing to challenge the whole of Section 1241's ballot access restriction in his capacity as a registered voter. Now, that argument was made to you in terms in the district court. That paragraph was explicitly quoted. I didn't see any response by you in the district court, although I might have missed it. I definitely didn't see any response in the briefing to us, because I looked for it and I couldn't find it. What is your response? The response is in terms of the record, was discussed in terms of Ms. Dreyer, where there is no affidavit or testimony below as the voter. In terms of Kelly, as a voter, I think under Aram, if, I guess it goes to the broader justiciability. In Aram, you're looking at someone, a voter has standing, and this is the Supreme Court's take on it as well, to vote for a particular candidate, an identified candidate. Now, in Aram, because of the identity there, it becomes a little unclear where you have a candidate like Aram who had made an effort, that cycle, to appear. So he had, as a voter, he had someone to vote for. I read this paragraph as saying, I mean, I read the paragraph, even if the Lieutenant Governor's contention is meritorious, the contention recounted earlier in the paragraph that Aram lacks standing to challenge because on the ground that he is not himself going to run, even if that contention is meritorious, now I'm coming back to the opinion, Aram possesses standing to challenge the whole of Section 1241's ballot access restrictions in his capacity as a registered voter. So translating that to this case, I would read it, even if your contention is meritorious as to Kelly's not really being serious about running, that is to say, the equivalent of the Lieutenant Governor's contention in that case, he's a registered voter. How do I get around that? Well, I read it slightly differently, and perhaps we just disagree on this. It would have been helpful if you'd read it slightly differently in the brief to us. Well, in Aram you didn't see the argument? Judge Fletcher, the argument as we took it in Aram was that Aram presented a specific attempt at candidacy and that the voter standing turned on that. And that's how we've responded to it. It clearly isn't a sufficient response. In your mind, the Court can, I think we're both agreed, I understand your concerns about the findings as to standing, can affirm on any ground supported by the record. And so I think given the record that we've developed here, even if there is voter standing, we're still faced with a very practical, and again, I don't view the importance of our justiciability arguments, of the standing argument as being this technical distinction, voter or not, as being a question of what traction can the Court have with respect to these ballot access laws, where you don't have a candidate, as we have in other cases, including in Aram, but in other cases, where they're making an effort, tendering signatures, and they haven't shown that it's futile, and others, and Mr. Kelly himself, has shown that it isn't futile to do so. That is a very practical argument that transitions certainly into the merits. Yeah, I'm trying to track. Is this a standing argument or is this a merits argument? Well, I'm making the transition. I think if we're to grant that as a voter who doesn't have any identified candidate to vote for who's made a reasonably diligent effort to do so. A voter who's made a reasonably diligent effort to do what? To vote? A voter who doesn't have a candidate who's made a reasonably diligent effort or would find it futile to try to qualify. I'm not sure Aram lets you go that far, because Aram, in the concluding footnote up to the section, talks about the diligence of Aram in that case. And the argument there that he wasn't diligent and so on and so forth, Judge O'Scanlan's opinion says, well, we don't know that that's really the requirement. But in any event, as we make clear in the next section, Aram possesses standing to challenge 1241, not only in his capacity as a candidate, but also as a voter. So isn't that suggesting that even if there wasn't a diligent candidate in view, as a registered voter, he would still have standing? I think it suggests, it could suggest that. And I mean, that's why I'd like, I'm moving on beyond standing. I mean, the Court made its factual findings. There's no clear error, but we have devoted most of our effort, I hope you appreciate, to the merits. I have to say that the Court committed, it seems to me, at least technical error in making findings of fact at a summary judgment stage. Now, it may be harmless in the sense that that district judge is going to be the fact finder sooner or later, but this was summary judgment, at which point you're supposed to take everything in their favor. I appreciate that. And I think both Mr. Sells and I, I didn't recite the standard of review or challenge the fact that we can affirm on any ground. And I think one thing the State and the plaintiff have done here is really try to, in light of some of the questions raised about the record in previous cases, develop a thorough record in terms of Montana's history, in terms of the particular interests, and really try to present a fulsome record for the Court to consider. And so I think it's there. Given that approach, what do you feel, are you suggesting that if we were to conclude that the district court made an error of outstanding, we should then address the merits and resolve the merits on this record? We would ask you to do so. Okay. And if that's the case, you're content with the record as it stands on a summary judgment so that if we draw all the inferences most favorable to the plaintiff in this case, that's how we could decide the merits? Well, these are on cross motions, and neither side in terms of – I'm not sure how many inferences are out there because we have worked so hard to create a detailed record. Have you appealed any denial of a cross motion that you made? No. Oh, well, it sounds like it may be – they're not on cross motions as far as we're concerned. So I guess in terms of – Now what? Well, let me tell you what my concern – I have two concerns. My concern is on the data. You said, well, you know, he's had all of this opportunity and been successful in getting qualifying. The data reflects – historical data, I believe, reflects that unqualified party candidates are in – I don't know what the categories are that we're looking, but I don't think there have been any candidates who have qualified for a statewide office under this March deadline, are there? That is a critical clarification. Without getting into the distinctions, let's call them new parties, parties that are petitioning. The parties that are on the – the third parties that are on the ballot now, there are four parties qualified for the ballot, at least in 2008. The Libertarian Constitution Party and the past other parties, the reason they got on the ballot in the first place – now, they've stayed on the ballot by qualifying with sufficient support in the elections. How they got on the ballot in the first place is through the petition process that has always had a March deadline. And before 1999, that petition process had required the exact same signature requirements. So the reason – the reason we bring up the new minor parties is twofold. First, as we've said, there is the option for him to run as a one-person minor party. In fact, there's some history of that. There are at least two candidates who have run as their own parties. This is in the Miller Affidavit. But the other reason we raise it is on the question of burden, because independent candidacies are so rare anyway. Well, Your Honor, to be fair, according to Kelly's own expert, more than three-quarters of the past hundred Senate elections had no independent candidate. So if that's the test, we're at risk of invalidating two-thirds of the state's ballot schemes, just because, in general, independent candidacies are rare. In Montana, there's also this ability, whereas an independent might go the independent route in other states because minor party qualification is more difficult, in Montana, we have a robust minor party qualified, but getting qualified through the petition process. So there are plenty of minor parties there. And that's – that is the point of the minor parties, is it shows two things. They're under the same burden as Mr. Kelly would be. Now, after 1999, the same March deadline, after 1999, they only need 5,000 signatures. But before then, lone candidates, like Ms. Shaw in 1996, the only candidate, she qualified herself for the Reform Party with 11,000 signatures under the March deadline, two years after Mr. Kelly qualified himself under the June. So – Well, I think the justification, we do have some legislative history in there. That is not the sole reason in terms of the legislative facts. But I'm talking about the administrative difficulty in all of that argument, assuming we get to that. How would we resolve that? Well, we – that turns, of course, on whether there's a severe burden, how you resolve it. It would be relatively deferential if there's not a severe burden, and that's our argument that whether you look through Montana history or across states, Montana compares as well as these other states. I'm just talking about the verification process. The verification process – Which is the justification for needing it not to be post-primary but pre-primary. That is – that is part of it, verifying signatures. And it's not the random sampling only – just to be clear, the random sampling – because we had two trials on this question in the past two months for petition processes. There's a lot of litigation over this. But the authenticity can be sampled, but the verification has to be for every signature. So you're looking at 12,000 signatures at two minutes apiece, 24,000 minutes spread out. That is part of it, that that takes time. That's going to take time wherever it's on the calendar. But the other reason why March has worked for the state, the unified deadline, same as the minor parties, is because there is also going on at the same period an expansion of the franchise through late registration and no-excuse absentee voting, early voting. So those are coming in, too, over the time where they would have been counting signatures beforehand. Is that still on the record? Yes. And it's – and we address it in the briefs. It's just – it's the law. Citing the law is that they have – that's what's been happening over the past year. But in terms of all the impact, that's – there's a lot of – well, all right. Well, I think one of the issues is in terms of – We always get accused of making findings of fact from the bench as appellate courts, and we get reminded by district judges, and I know Judge Jones will remind us of this. You know, the fact finder who's most useful is the one who sits on the bench with the witnesses and, you know, you can get the interplay. And I have a lot of difficulty addressing a major issue like this, and he's fraught election disputes, voting disputes, on a paper record that we've got here. Well, I understand there's deposition testimony, too, but, you know. Anyway, that's just my personal interpretation. Well, and we have – certainly after Nader and the Court's concerns that there wasn't a thorough enough record, I think both parties did our best to develop that. I'm not – yeah, I'm not challenging, you know, your good efforts. I'm just saying that it's – since the district court didn't get to it. And there is a question of adjudicative versus legislative facts here, and – Well, I appreciate it. Thank you. The question, then – and this is the practical issue – is that given that there was no change in admittedly rare independent candidacies, and we still had these same minor party, new party petitions qualifying over the same time, is there in Montana, when we reject litmus tests – Anderson had a date, but we can't apply that date like a litmus test to Montana. Montana has different interests. Anderson, of course, is a presidential election. When you look at the record, the best we can do is do these chronological and geographical comparisons. And when both sides look at it, the only factor that had an effect on ballot access is our facially constitutional 5 percent signature requirement. That is – has been upheld repeatedly. The deadline really is a question of whether Mr. Kelly has a right to run – to decide to run early rather than late. And courts have rejected that. When there's not a proven burden, and we have these new party petitions, including sole new party petitions qualifying, there's no proof there of any burden or at least a severe burden. What is the justification, though, for requiring him to run as a party? I mean, there's some – I suppose the voters might feel that reasonably – or the candidate might reasonably feel that the voters would – you know, maybe against parties. We don't want party politics. And so – but he has to list himself as a party rather than just as a candidate. That's not a requirement. And that's not – that is – No, but you say that is a justification. That is an option. Well, that option is a justification, you say, for the burden that the State places on him. And it's a little more than that because we understand he has a right not to associate with a party. The point is, under Montana's law, there's no difference on the ballot in terms of an indication. We have a – I think attached to Professor Donovan's report – a copy of someone who is running as an independent. It doesn't make a difference for purposes of his designation. So it is one option, and it's an option that, for example, Judge Easterbrook discusses in his Stevenson concurrence. But, really, the main point of the minor – the main takeaway from the minor parties is the fact that they have qualified under the same rules and the same date as Mr. Kelly challenges, suggesting that it's – that reasonably diligent candidates, as exemplified by these minor party entrepreneurs getting on the ballot, do get on the ballot. I think the rarity of independent candidacies is a – it's a national phenomenon. It's not limited here. And that makes some of these comparisons difficult. And that's another reason to look at the minor parties qualifying. Let me just say, you're about at the end, so if you have something you want to say in summary, maybe now's the time to say it. Let me address the legislative history. The political stability argument, which is a recognized state interest, if their job is to shut down people outside of the Democratic and Republican parties, they've done a pretty bad job of it, given Montana's history. That is not the only interest. But we've had – we've had as many – we do very well among the 50 states in terms of participation by candidates outside of the major party system. Independent candidates are rare everywhere. And so that doesn't tell us as much about what's going on in Montana. Thank you very much. Thank you. I think we've covered pretty much all of it, but if you'd like to respond. I think I'd like to make just two or three points in response. One, I think Mr. Johnstone misstated what I think is an undisputed record. He said that based on the history of minor party access and the timing of the changes, we don't see any effect of the deadline. And that's not what the record shows. As we point out on page 14 of our brief, both sides, experts, analyzed signature deadlines, signature requirements, and found a statistically significant relationship between the interaction  So we know that those two factors in combination have a significant effect. But that's the notion that it's harder to get people to sign up or solicit. That's what the finding would suggest, yeah. The earlier the deadline is, the more burdensome a large number of signatures is. This is another way to think about it. We cite all that at page 14 of our brief. And Mr. Johnstone also spent some time on this notion of reasonably diligent candidates, that there are others who could appear on the ballot. And that is an important factor in this case. I don't want to minimize that. But it's not the only factor. And I would urge this Court to look at footnote 12 of the Anderson case, where the Supreme Court notes that in 1980, there were five, count them, five non-major party candidates who had met the deadline in Ohio that John Anderson challenged. They were reasonably diligent. They made it on. And yet, the Supreme Court struck down that law because there's another interest at stake. And the Supreme Court clearly discusses that. You sort of have to read between the lines, knowing the history of Ronald Reagan and George Bush and John Anderson and that whole campaign. But what the Supreme Court suggests is that there's an independent constitutional value to being able to enter a race once the issues have started to become clear. And that is not addressed by this notion of other minor parties have been able to get on the ballot. And Judge Fisher, just to address your question about should we resolve this on the merits, we've included the statement of disputed issues in the excerpts of records, so you can see those. And if I were to characterize those, I would say that most of the disputes are about the opinions that are drawn from the undisputed facts. We dispute, for example, Lisa Kimmett's conclusory opinion that we need more time in order to, we're too busy at other times of the year. But if you look at the actual facts, I don't think there's any dispute about how long it takes to verify signatures and what the deadlines are and so on. So I think if the Court were to put aside the conclusions and look at the facts as they are in the affidavits and the deposition testimony, that there's really not a whole lot of dispute there. Okay. Thank you. Thank both of you for useful arguments. Kelly v. McCulloch now submitted for decision. That completes our week. Thank you very much. It's nice to end on a very highly confident note. Congratulations.
judges: Jones, Fletcher W. , Fisher